In the Matter of the Estate of HERMAN STUTZER, Deceased.

Surrogate's Court, Kings County, April 25, 1935.

*Wingate & Cullen* [*James S. Price* of counsel], for the executors.

*John Hill Morgan* [*Thomas A. Sully* of counsel], for the Brooklyn Institute of Arts and Sciences.

*James V. Coffey*, for the Rensselaer Polytechnic Institute.

*Cullen & Dykman*, for the Brooklyn Society for the Prevention of Cruelty to Children.

*Frederick A. Keck*, special guardian.

WINGATE, S. The questions of testamentary interpretation here raised are direct products of the days of financial depression. The will was executed on April 9, 1932, and was admitted to probate about thirteen months later. The gross assets of the estate amounted to about $540,000, of which over $480,000 was in the form of stocks and bonds, the major portion of the balance consisting of cash. The net increase in the value of the securities which was realized during the period of the administration amounted to about $20,000 in addition.

The will, after making specific bequests ·of various items of personal property, and giving $1,200 for perpetual care of a cemetery plot, continued as follows:

" *Third.* I give and bequeath to the Brooklyn Institute of Arts and Sciences   *   *   *   the sum of $10,000, and request that the · Institute permit the income therefrom to be accumulated and added to the principal until the fund amounts to the sum of *   *   *   $15,000, and thereafter to apply one-third of the income

from the fund so increased for the benefit of the Department of Education of said Institute, one-third for the benefit of the Museum thereof, and one-third for the benefit of the Botanic Garden. This request is intended merely as a suggestion, and is not intended to impose a legal obligation contrary to the statute against accumulations.

"*Fourth.* I give and bequeath to the Rensselaer Polytechnic Institute, of Troy, New York, the sum of * * * $10,000, and direct that the income thereof be used for the purchase of scientific instruments or equipment for said Institute."

The fifth and sixth items gave legacies of $5,000 each to Brooklyn Society for the Prevention of Cruelty to Children and Hopewell Society for the general purposes of the respective charities.

Following these directions, there was inserted the following provision, which is the basis of the present controversy:

"*Seventh.* I further direct that, in view of the severe financial conditions prevailing at the time of the making of this will, my executors shall be authorized to pay the foregoing legacies in guaranteed mortgages or mortgage certificates at par, or in such other securities, at their market value, as they may select from among the securities of my estate, to such amount as may be necessary to pay the said legacies either in whole or in part, with the right to make up any difference in cash."

In the succeeding three items the testator erected three trusts in the sum of $100,000 each, one for each of his daughters, and in the eleventh erected a trust of $100,000 plus the residue of his estate, for the life use of his wife. On her death, the principal is to be divided into three parts, one being added to each of the previous trusts for the daughters.

The twelfth and thirteenth items define the powers of the executors and trustees regarding retention of securities and reinvestment of funds and their authority to employ securities in the erection of the trusts. Item fourteenth appoints the fiduciaries and further defines their powers in relation to their dealings with the estate property.

In the fifteenth it is provided that if the net distributable estate shall be insufficient to erect the four trusts in the aggregate sum of $400,000, the four charitable bequests " shall abate to the extent necessary to permit the trust funds provided for in the Eighth, Ninth, Tenth and Eleventh clauses hereof to be set up at the sum of $100,000 each."

The account demonstrates that the total par value of the mortgages and mortgage certificates received by the executors was $203,750 and their appraised value $176,337.50. In other words,

the average value of all of the securities of the estate of this variety is slightly over eighty-six and one-half per cent of their par value.

Pursuant to the authority claimed by them under item seventh, *supra*, the executors have tendered to Brooklyn Institute of Arts and Sciences, in satisfaction of the bequest under item third, a mortgage certificate of the par value of $10,000 of Holbrook Hall Realty Company which the executors have obtained as the result of a split-up of a larger certificate owned by the testator. According to the account, this is one of the two most seriously depreciated of all the securities of the like nature belonging to the estate, being valued at thirty per cent of par. It is alleged, and for the purpose of this determination must be taken as true (*Matter of Keeling*, 148 Misc. 798), that at the time of such tender the mortgage was seriously in default in interest and amortization of principal, and that the total due thereon was in excess of the value of the mortgaged premises.

Their action in respect to the legacy of the Rensselaer Polytechnic Institute has been similar, it being asserted and not denied that whereas the mortgage certificate tendered has a par value of $10,000, its actual worth is only $2,700.

Both charities have declined to accept these tenders in satisfaction of their rights and submit to the court the question of their obligation so to do.

One of the executors is the husband of the beneficiary who is the life tenant under the ninth item of the will, and who receives a secondary life estate under the eleventh. The bonds and mortgages which the executors have allocated to her trust in partial payment have a face value of $55,437.50 and an actual value of $49,391.25, or over eighty-nine per cent, as against the value of thirty per cent or less of those set aside for the charities.

Authority for this extraordinary discrimination is claimed by the executors under the terms of the will. No extraneous evidence has been introduced, wherefore decision must be based solely on the testator's intention as gathered from the four corners of the document itself. (*Matter of Corlies*, 150 Misc. 596, 599; affd., 242 App. Div. 703; *Matter of Weil*, 151 Misc. 841, 844; *Matter of Mann*, 138 id. 42, 49.)

The testator's primary desire was obviously to provide for the support and maintenance of his wife and three daughters to the extent of the trusts for $100,000 each. This is apparent from the provisions of item fifteenth which directed that if the total of $400,000 dedicated for this purpose were not available, the gifts to the charities should abate so far as might be necessary to effectuate this wish.

His second intent was that the four charities should receive the amounts of their several general legacies aggregating $30,000, if and when the primary benefits had been satisfied.

Finally, if anything remained after the execution of these preferred wishes, it was to go to the primary objects of his bounty, being added to the principal of the trust for his wife, and, after her death, to be enjoyed by his daughters for their lives, *pro rata.*

The entire tenor of the instrument indicates an apprehension on the part of the testator lest his estate should be found insufficient to effectuate the purposes which he had in mind. With the object of guarding against any such eventuality, he inserted two provisions, the first directing that the charitable legacies should abate in favor of the trust provisions in the event of a dearth of assets to satisfy both; the second authorizing his fiduciaries to satisfy the charitable legacies in the manner set forth in item seventh.

As events have proved, testator's fears were groundless. His gross estate amounted to $570,348.39, and the net estate available for distribution amounts, according to the account, to upwards of $500,000, or enough to pay every single gift in the will in full and leave an additional sum of approximately $70,000 to pass into the residuary trust for the wife, increasing by almost three-quarters the only amount which testator desired her to receive in preference to the gifts to the charities. In view of this situation, as events have developed, the acts of the executors in attempting to get rid of the charities by a payment to them of thirty cents on the dollar or less, of the amounts which the testator indicated he desired them to receive, appears a somewhat striking disregard of his obvious wish.

In spite of these moral considerations, however, it is indisputable that by the provisions of item seventh the testator actually granted certain discretion to make payment in kind of the benefits designed for the charities. That it would, in all human probability, not have been given had he been able to foresee the ultimate eventuality, does not detract from the fact. The question thereupon arises as to whether this authorization is so broad as to permit the performance of the act actually attempted by the fiduciaries, namely, of the exhibition of the gross partiality here displayed by the allocation of the two worst securities in their possession to the charities, to the end that the immediate family of one of their number should be benefited to their detriment.

The right in this regard, claimed by the fiduciaries, resolves itself, in essence, into one of an authority wholly to nullify the testamentary gift, since if it had happened that some security within the description of those in respect to which the authority

was given, had chanced to be worth nothing instead of the twenty-six to thirty per cent of its face value actually here present, such an one would have been within the letter of the authority. The question, therefore, arises as to whether such an intention in its alternate form can reasonably be attributed to the testator.

It is a primary principle of testamentary construction that every will is drawn honestly and in good faith, and that the testator expected all legacies to be paid in full. (*McGoldrick* v. *Bodkin*, 140 App. Div. 196, 199; *Matter of Neil*, 238 N. Y. 138, 140; *Matter of Title G. & T. Co.*, 195 id. 339, 344, 345; *Wetmore* v. *St. Luke's Hospital*, 56 Hun, 313, 321; *Matter of Smallman*, 138 Misc. 889, 897; *Matter of Rae*, 140 id. 530, 531; *Matter of Hoffman*, 146 id. 535, 536; *Matter of Gavey*, 147 id. 332, 335.)

It is somewhat unusual in these days to find an estate consisting preponderantly of securities, in which no wholly worthless assets are found in one of the large classes thereof. Whereas the testator might have hoped for such a desideratum, he could obviously not have anticipated it with any confidence. To hold, therefore, that when the testator in one paragraph purported to give a $10,000 benefit, he intended by the succeeding one to give a power which would potentially wholly nullify this gift, is to impute a fraudulent intention to him which the court will not presume.

The alternative interpretation of the authority granted to the executors is of an authorization to pay in kind subject to the limitation that his fiduciaries shall treat all beneficiaries with substantial impartiality and equality. True, they *may* pay the desired benefit with securities of the estate, but the securities selected for the purpose must possess the same proportionate value to the entire list of securities as the class from which the fiduciaries elect to make the payment.

The very nature of the office of fiduciary, as the derivation of the designation implies, indicates the existence of a trust relation which precludes the exercise of the authority in a manner which is tinctured by bias or partiality. These executors are trustees for the charities just as fully as they are for the wife or connections of one of their number, and in so far as they exercise any discretionary powers to the detriment of the former, they are guilty of an abuse of discretion and a violation of their trust duties. Their primary obligation, which a court of equity, being of good conscience, will enforce, is the duty of *uberrima fides.* (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464; *Matter of Rooney* v. *Wiener*, 147 Misc. 48, 50; *Matter of Taft*, 145 id. 435, 439, 440; *Matter of Judge*, 141 id. 254, 255.) On the main question of interpretation here submitted, therefore, the court determines that the tender of the securities

made to the objecting charitable legatees was inadequate and that if the executors desired to avail themselves of the permissive authority granted by item seventh of the will they were under obligation to do so by the use of securities which were worth a fair average of the value of all securities of the same class.

Schedule E of the account indicates that the executors have already disposed of all securities of this type which comply with this requirement by their transfer to the trusts. In this situation, they have placed it out of their power to comply with the authorization of item seventh so far as payment in kind in mortgages or mortgage certificates are concerned, and can solve their obligations to the charities only by payment in securities at their market value or in cash.

Since the remaining questions of construction are not the subject of controversy, extended discussion thereof is unnecessary. The questions designated " (a) " and " (b) " in the prayer for relief are answered in the affirmative subject to the limitation that the determination of whether reinvestments are " perfectly safe," and that continued holding is to be " safe " imposes upon the trustees the obligation of thorough, painstaking inquiry and consideration of the presence of these stated prerequisites to acquisition or retention. The standard of conduct which is required of these fiduciaries is that which is stated at length in *Matter of McCafferty* (147 Misc. 179, beginning at the bottom of p. 202). They are not limited to legally authorized investments. On the other hand, they are under obligation to make their determinations as to whether a security is " safe " for continued holding or " perfectly safe " for original purchase, after careful inquiry and consideration. They are not to be held responsible for errors of judgment after fully informed examination, but are not endowed with the regal immunity where " the king can do no wrong."

In accordance with the express directions of the will, the trustees may accept the securities, which have been, or may hereafter be allocated to the several trusts, without liability beyond their actual worth at the time of receipt. For their dealings therewith subsequent to receipt, their obligation is that hereinbefore defined.

Enter decree on notice.